IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Eliseo Cruz Bautista, | Case No. 1:25-cv-00280 |
| Petitioner, | |
| v. | |
| Pamela Bondi, Attorney General, | |
| Kristi Noem, Secretary, U.S. Department of Homeland Security, | **RESPONSE OF FEDERAL RESPONDENTS TO PETITION AND TO MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION** |
| Department of Homeland Security, | |
| Todd M. Lyons, Acting Director of Immigrant and Customs Enforcement, | |
| Immigration and Customs Enforcement, | |
| David Easterwood, Acting Director, St. Paul Field Office Immigration and Customs Enforcement, | |
| and, | |
| Kelly Leben, Sheriff of Burleigh County, | |
| Respondents. | |

The United States of America, by Nicholas W. Chase, United States Attorney for

the District of North Dakota, and Tara Vavrosky Iversen, Assistant United States

Attorney, on behalf of Respondents Pamela Bondi, Attorney General; Kristi Noem,

Secretary, U.S. Department of Homeland Security; Department of Homeland Security;

Todd M. Lyons, Acting Director, Immigration and Customs Enforcement; Immigration

and Customs Enforcement; and David Easterwood, Acting Director, St. Paul Field Office

Immigration and Customs Enforcement (hereinafter Federal Respondents[1] or the United

States) hereby submit this combined Response to the Petition (ECF 1) and the Emergency

Motion for Temporary Restraining Order or Preliminary Injunction (ECF 3, 8). The

United States respectfully requests that this Court deny Petitioner's Motion and dismiss

the Petition.

The United States recognizes that in *Beltran v. Bondi*, ECF 1:25-cv-00258 18

(D.N.D. Dec. 5, 2025), this Court ruled on the very question once again before it. This

Court held Petitioner Beltran, who is similarly situated to Petitioner Cruz Bautista, was

entitled to a bond hearing under 8 U.S.C. § 1226(a)(2)(A). *Id.* p. 17. With the utmost

respect to the Court and its ruling, and with recognition of the numerous other district

courts in the Eighth Circuit and around the United States that have ruled to the contrary, it

continues to be the position of the United States that the detention of Petitioner Cruz

Bautista is lawful under 8 U.S.C. § 1225(b)(2). Petitioner Cruz Bautista is an applicant

for admission who is not "clearly and beyond a doubt entitled to be admitted" to the

United States. Petitioner himself does not claim that he has lawful status to remain in the

United States. *See generally* ECF 1.[2] Under these circumstances, Petitioner "shall be

---

[1] This response is not filed on behalf of Sheriff Kelly Leben, because he is not a federal
employee, and the Burleigh-Morton Detention Center is not a federal facility. However,
all arguments made on behalf of the Federal Respondents apply with equal force to
Sheriff Leben, because Petitioner is being detained at the request of the United States.

[2] Petitioner asserts he has a pending application for Deferred Action for Childhood Arrivals
("DACA") status that is awaiting adjudication by United Sates Immigration and
Citizenship Services ("USCIS"). ECF 1 at ¶¶ 35–36. Petitioner also alleges he is the

detained for a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(A).

Additionally, Federal Respondents have agreed not to move Petitioner outside the

Districts of North Dakota or Minnesota during the pendency of this proceeding unless in

a case of exigent circumstances. Declaration of Michelle M. Erdmann (Erdmann Decl.) at

¶ 3, Ex. A. Because Petitioner's detention is supported by statute, regulation, and the

Constitution, the Court should deny his request for a temporary restraining order or

preliminary injunction, and dismiss his petition.

## I.    Factual Background and Procedural History.

Petitioner Eliseo Cruz Bautista (Petitioner) is a native and citizen of Mexico. ECF

1, ¶ 29.  Petitioner states he entered the United States without inspection on March 31,

2006, at the age of 15. *Id*. at ¶ 30. Petitioner states he was taken into custody by Federal

Respondents as he was leaving work on September 2, 2025, and that he has been in

custody since that time. *Id.* at ¶¶ 39, 50–51. Petitioner has requested a custody

redeterminaton before an Immigration Judge three times, and each time an Immigration

Judge has held the Immigration Court lacks authority to consider Petitioner for release on

bond under *Matter of Yajure Hurtado*, 29 I&N Dec. 216 (BIA 2025). Declaration of

Deportation Officer James L. Van Der Vaart (Van Der Vaart Decl.) at ¶ 11, Ex. C. The

most recent custody redetermination was held on December 11, 2025. *Id.* Petitioner is

---

beneficiary of an I-130 petition based on his marriage to a United States citizen. ECF 1 at
¶¶ 43–44. Petitioner does not allege that either of these facts, at present, confers Petitioner
lawful status to remain in the United States.

currently being held at the Burleigh-Morton Detention Center in Bismarck, North Dakota. ECF 1 at ¶ 51.

Petitioner has attempted to obtain legal status to remain in the United States several times over the years. On October 9, 2012, Petitioner applied for an I-821D, Deferred Action for Childhood Arrivals and an I-765, Employment Authorization. Van Der Vaart Decl. at ¶ 4, Ex. A. USCIS denied both applications on January 14, 2014. *Id.* at ¶ 5, Ex. A. On September 8, 2015, Petitioner applied for an I-192, Application for Advance Permission to Enter as a Non-Immigrant; an I-918A, Petition for U Visa; and an I-765, Employment Authorization. *Id.* at ¶ 6, Ex. A. USCIS denied all three applications on January 22, 2020. *Id.* at 7, Ex. A. On January 9, 2021, Petitioner applied for an I-821D, Deferred Action for Childhood Arrivals, and an I-765, Employment Authorization. *Id.* at ¶ 8. These applications are still pending. *Id.*

On November 21, 2025, an immigration judge ordered Petitioner removed to Mexico. *Id.* at ¶ 10, Ex. B. Petitioner reserved appeal, which is due by December 22, 2025. *Id.* As of December 11, 2025, there is no record of an appeal filed with the Board of Immigration Appeals (BIA). *Id.* at ¶ 10. Of note, the Immigration Judge who held Petitioner's custody redetermination hearing on December 11, 2025 noted that if the Immigration Court had authority to grant Petitioner release on bond, the Immigration Court would deny release as the removal order is a significant factor indicating that Petitioner presents a serious flight risk. *Id.* at ¶ 11, Ex. C.

**II.    Statutory Framework.**

    **A.    Before 1996, Immigration Laws Gave Preferential Treatment to Aliens Unlawfully Present in the United States.**

For more than a century, the immigration laws have authorized immigration officials to charge noncitizens as removable from the country, arrest noncitizens subject to removal, and detain noncitizens during their removal proceedings. *See Abel v. United States*, 362 U.S. 217, 232–37 (1960). The Immigration and Nationality Act ("INA"), as amended, contains a comprehensive framework governing the regulation of aliens, including the creation of proceedings for the removal of aliens unlawfully present in the United States and requirements for when the Executive is obligated to detain aliens pending removal. *See generally* 8 U.S.C. §§ 1225, 1226, 1231. "The rule has been clear for decades: '[d]etention during deportation proceedings [i]s . . . constitutionally valid.'" *Banyee v. Garland*, 115 F.4th 928, 931 (8th Cir. 2024), *rehearing by panel and en banc denied*, *Banyee v. Bondi*, No. 22-2252, 2025 WL 837914 (8th Cir. Mar. 18, 2025) (citing *Demore v. Kim*, 538 U.S. 510, 523 (2003)); *see Demore*, 538 U.S. at 523 n.7 ("[P]rior to 1907 there was no provision permitting bail for *any* aliens during the pendency of their deportation proceedings."); *Carlson v. Landon*, 342 U.S. 524, 538 (1952) ("Detention is necessarily a part of this deportation procedure.").

Before 1996, the federal immigration laws required the detention of aliens who presented at a port of entry but allowed aliens who were already unlawfully present in the United States to obtain release pending removal proceedings. *Hurtado*, 29 I. & N. Dec. at 222–223 (citing 8 U.S.C. §§ 1225(a), 1251 (1994)); *Hing Sum v. Holder*, 602 F.3d 1092,

1099–1100 (9th Cir. 2010) (same). At the time, the INA "provided for two types of removal proceedings: deportation hearings and exclusion hearings." *Hose v. I.N.S.*, 180 F.3d 992, 994 (9th Cir. 1999) (en banc). An alien who arrived at a port of entry would be placed in "exclusion proceedings and subject to mandatory detention, with potential release solely by means of a grant of parole." *Hurtado*, 29 I. & N. Dec. at 223. In contrast, an alien who physically entered the United States unlawfully would be placed in deportation proceedings. *Id.*; *Hing Sum*, 602 F.3d at 1099–1100. Aliens in deportation proceedings, unlike those in exclusion proceedings, "were entitled to request release on bond." *Hurtado*, 29 I. & N. Dec. at 223 (citing 8 U.S.C. § 1252(a)(1) (1994)).

    The INA's prior framework distinguishing between aliens based on physical "entry" had the "'unintended and undesirable consequence' of having created a statutory scheme where aliens who entered without inspection 'could take advantage of the greater procedural and substantive rights afforded in deportation proceedings,' *including the right to request release on bond*, while aliens who had 'actually presented themselves to authorities for inspection . . . were subject to mandatory custody.'" *Hurtado*, 29 I. & N. Dec. at 223 (emphasis added) (quoting *Martinez v. Att'y General of U.S.*, 693 F.3d 408, 413 n.5 (2012)); *see also Hing Sum*, 602 F.3d at 1100 (similar); H.R. Rep. No. 104-469, pt. 1, at 225 (1996) ("House Rep.") ("illegal aliens who have entered the United States without inspection gain equities and privileges in immigration proceedings that are not available to aliens who present themselves for inspection").

**B.     IIRIRA Eliminated the Preferential Treatment of Aliens Unlawfully Present in the United States and Mandated Detention of all "Applicants for Admission."**

Congress passed the Illegal Immigration Reform and Immigration Responsibility Act ("IIRIRA"), Pub. L. 104-208, 110 Stat. 3009 (Sept. 30, 1996), to stop conferring greater privileges and benefits on aliens who enter the United States unlawfully as compared to those who lawfully present themselves for inspection at a port of entry. *See Torres v. Barr*, 976 F.3d 918, 928 (9th Cir. 2020) (en banc) (Among other things, the law had the goal of "ensur[ing] that all immigrants who have not been lawfully admitted, regardless of their legal presence in the country, are placed on equal footing in removal proceedings under the INA.").

To that end, IIRIRA replaced the prior focus on physical "entry" and instead made lawful "admission" the governing touchstone. IIRIRA defined "admission" to mean "the *lawful* entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A) (emphasis added). In other words, the immigration laws would no longer distinguish aliens based on whether they had managed to evade detection and enter the country without permission. Instead, the "pivotal factor in determining an alien's status" would be "whether or not the alien has been *lawfully* admitted." House Rep., *supra*, at 225 (emphasis added); *Hing Sum*, 602 F.3d at 1100 (similar). IIRIRA also eliminated the exclusion-deportation dichotomy and consolidated both sets of proceedings into "removal proceedings."  *Hurtado*, 29 I. & N. Dec. at 223.

IIRIRA effected these changes through several provisions codified in Section 1225 of Title 8:

**Section 1225(a):** Section 1225(a) codifies Congress's decision to make lawful "admission," rather than physical entry, the touchstone. That provision states that an alien "present in the United States who has not been admitted or who arrives in the United States" "shall be deemed . . . an applicant for admission":

> An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission.

8 U.S.C. § 1225(a)(1). "All aliens . . . who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States" are required to "be inspected by [an] immigration officer[]." *Id*. § 1225(a)(3). The inspection by the immigration officer is designed to determine whether the alien may be lawfully "admitted" to the country or, instead, must be referred to removal proceedings.

**Section 1225(b):** IIRIRA also divided removal proceedings into two tracks— expedited removal and non-expedited "Section 240" proceedings—and mandated that applicants for admission be detained pending those proceedings. 8 U.S.C. §§ 1225(b)(1)– (2).

Section 1225(b)(1)'s "expedited removal proceedings" can be applied to a subset of aliens—those who (1) are "arriving in the United States," or who (2) have "not been admitted or paroled into the United States" and have "not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." 8 U.S.C. § 1225(b)(1)(A)(i)–(iii). As to these aliens,

the immigration officer shall "order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." *Id*. § 1225(b)(1)(A)(i). In that event, the alien "shall be detained pending a final determination of credible fear or persecution and, if found not to have such fear, until removed." *Id*. § 1225(b)(1)(B)(iii)(IV); *see also* 8 C.F.R. § 235.5(b)(4)(ii). An alien processed for expedited removal who does not indicate an intent to apply for a form of relief from removal is likewise detained until removed. 8 U.S.C. § 1225(b)(1)(A)(i), (B)(iii)(IV); *see* 8 C.F.R. § 235.3(b)(2)(iii).

Section 1225(b)(2) is a "catchall provision that applies to all applicants for admission not covered by [subsection (b)(1)]." *Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018). It requires that those aliens be detained pending Section 240 removal proceedings:

> Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien *shall be detained* for a proceeding under section 1229a of this title [Section 240].

8 U.S.C. § 1225(b)(2)(A) (emphasis added). *See* 8 C.F.R. § 235.3(b)(1)(ii) (mirroring Section 1225(b)(2) detention mandate); *Jennings*, 583 U.S. at 302 (holding Section 1225(b)(2) "mandate[s] detention of aliens throughout the completion of applicable proceedings and not just at the moment those proceedings begin").

**Section 1226:**  IIRIRA also created a separate authority addressing the arrest, detention, and release of aliens generally (versus applicants for admission specifically). *See* 8 U.S.C. § 1226. This is the only provision that governs the detention of aliens who,

for example, lawfully enter the country but overstay or otherwise violate the terms of their visas, or are later determined to have been improperly admitted. The statute provides that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." *Id*. § 1226(a).[3] Detention under this provision is generally discretionary; the Attorney General "may" either "continue to detain the arrested alien" or release the alien on bond or conditional parole. *Id*. § 1226(a)(1)–(2).

That "default rule" does not apply to certain criminal aliens who are being released from detention by another law enforcement agency. *Jennings*, 583 U.S. at 288; *see* 8 U.S.C. § 1226(c). Section 1226(c) provides "[t]he Attorney General shall take into custody" certain classes of criminal aliens—those who are inadmissible or deportable because the alien (1) "committed" certain offenses delineated in 8 U.S.C. §§ 1182 and 1227; or (2) engaged in terrorism-related activities. 8 U.S.C. § 1226(c)(1). The Executive must detain these aliens "when the alien is released, without regard to whether the alien is

---

[3] Although the relevant statutory sections refer to the Attorney General, the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002), transferred all immigration enforcement and administration functions vested in the Attorney General, with few exceptions, to the Secretary of Homeland Security. The Attorney General's authority—delegated to immigration judges, *see* 8 C.F.R. § 1003.19(d)—to detain, or authorize bond for noncitizens under section 1226(a) is "one of the authorities he retains . . . although this authority is shared with [DHS] because officials of that department make the initial determination whether an alien will remain in custody during removal proceedings." *Matter of D-J-*, 23 I. & N. Dec. 572, 574 n.3 (A.G. 2003).

released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense." *Id.*

Congress recently amended Section 1226(c) through the Laken Riley Act, Pub. L. No. 119-1, § 2, 139 Stat. 3, 3, (2025), which requires detention of (and prohibits parole for) aliens who (1) are inadmissible because they are physically present in the United States without admission or parole, have committed a material misrepresentation or fraud, or lack required documentation; and (2) are "charged with, arrested for, [] convicted of, admit[] having committed, or admit[] committing acts which constitute the essential elements of" certain listed offenses. 8 U.S.C. § 1226(c)(1)(E).

### C.    DHS Concluded that Section 1225(b)(2) Requires Detention of All Applicants for Admission.

For many years after IIRIRA, immigration judges treated aliens who entered the United States without admission and were later encountered away from the border as being subject to discretionary detention under 8 U.S.C. § 1226(a) rather than mandatory detention under 8 U.S.C. § 1225(b)(2). *See Hurtado*, 29 I. & N. Dec. at 225 n.6.

On July 10, 2025, the Department of Homeland Security (DHS) "revisited its legal position on detention and release authorities" and issued guidance that brought the Executive's practices in line with the statute's plain text. *See* U.S. Customs and Border Protection, Detention of Applicants for Admission, https://www.cbp.gov/sites/default/files/2025-09/intc-46100_-_c1_signed_memo_-_07.10.2025.pdf (last visited December 11, 2025). Specifically, DHS concluded that all aliens who enter the country without being admitted are "subject to mandatory detention

11

under INA § 235(b) [8 U.S.C. § 1225(b)] and may not be released from DHS custody except by INA § 212(d)(5) parole." *Id.* As a result, the "only aliens eligible for a custody determination and release on recognizance, bond, or conditional parole under INA § 236(a) [8 U.S.C. § 1226(a)] are aliens admitted to the United States and chargeable with deportability under INA § 237 [8 U.S.C. § 1127]." *Id.*

The Board of Immigration Appeals soon adopted this interpretation in *Hurtado*. The Board concluded that Section 1225(b)(2)'s mandatory detention regime applies to *all* aliens who entered the United States without inspection and admission:

> Aliens . . . who surreptitiously cross into the United States remain applicants for admission until and unless they are lawfully inspected and admitted by an immigration officer. Remaining in the United State for a lengthy period of time following entry without inspection, by itself, does not constitute an "admission."

29 I. & N. Dec. at 228; *see also id.* at 225 ("Immigration Judges lack authority to hear bond requests or to grant bond to aliens . . . who are present in the United States without admission").

## III.    Argument.

The parties' disagreement in this case comes down to whether Petitioner is properly detained pursuant to § 1225 or § 1226. Federal Respondents say Petitioner is properly detained pursuant to § 1225, which governs the detention of noncitizens who are "applicants for admission." 8 U.S.C. § 1225(a)(3). Congress says so as well, expressly directing that noncitizens like Petitioner who get into the United States without being inspected "shall be deemed for purposes of this chapter an applicant for admission" and then detained pursuant to § 1225(b)(1) or § 1225(b)(2). *Id.* § 1225(a)(1). Under a

12

straightforward reading of the statute, Petitioner is subject to mandatory detention under § 1225(b)(2). He is not entitled to a bond hearing, and the Court should deny his habeas petition.

### A.    Standard of Review.

The purpose of a preliminary injunction or temporary restraining order "'is merely to preserve the relative positions of the parties'" until the case can be resolved. *Univ. of Tex. v. Komenich*, 451 U.S. 390, 395 (1981).[4] The burden on the moving party is great because injunctive relief is "an extraordinary remedy never awarded as a right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A court may grant a preliminary injunction only upon a proper showing of (1) the probability of success on the merits, (2) that the movant will suffer irreparable harm absent the injunction, (3) the balance between this harm and the harm an injunction would cause other parties, and (4) where the public interest lies. *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). The movant bears the burden of proof for each factor. *Gelco v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987). The party seeking such relief bears "a heavy burden" and a "difficult task." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010). This already stringent burden is even higher on a party such as Petitioner who seeks a mandatory preliminary injunction—one which "alters the status quo by commanding some positive act, as opposed to a prohibitory injunction seeking only to

---

[4] The same legal standard applies to both a request for a temporary restraining order or a preliminary injunction. *Izabella HMC-MF, LLC v. Radisson Hotels Int'l, Inc.*, 378 F. Supp. 3d 775, 778 n.2 (D. Minn. 2019).

maintain the status quo." *TruStone Fin. Fed. Credit Union v. Fiserv, Inc.*, No. 14-CV-424 (SRN/SER), 2014 WL 12603061, at *1 (D. Minn. Feb. 24, 2014). "Mandatory preliminary injunctions are to be cautiously viewed and sparingly used." *Id*.

**B.    Preliminary Injunction Factors.**

**1.    Petitioner is not entitled to injunctive relief because he is not likely to succeed on the merits of his claim.**

In analyzing a motion for injunctive relief, the likelihood of success on the merits is "[t]he most important of the Dataphase factors." *Shrink Mo. Gov't PAC v. Adams*, 151 F.3d 763, 764 (8th Cir. 1998). Petitioner does not have a likelihood of success on his claims, and his motion should be denied.

i.    Section 1225(b)(2) mandates detention of aliens, like petitioner, who are present in the United States without having been lawfully admitted.

Under the plain language of Section 1225(b)(2), DHS is required to detain all aliens, like Petitioner, who are present in the United States without admission and are subject to removal proceedings—regardless of how long the alien has been in the United States or how far from the border they ventured. That unambiguous language resolves this case. *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 676 (2020) ("Our analysis begins and ends with the text.").

Section 1225(a) defines "applicant for admission" to encompass an alien who either "arrives in the United States" or who is "present in the United States who has not been admitted." 8 U.S.C. § 1225(a)(1). And "admission" under the INA means not physical entry, but lawful entry after inspection by immigration authorities. 8 U.S.C.

§ 1101(a)(13)(A); *Mejia Olalde v. Noem*, No. 1:25-cv-00168, 2025 WL 3131942, at *3 (E.D. Mo. Nov. 10, 2025). Thus, an alien who enters the country without permission is and remains an applicant for admission, regardless of the duration of the alien's presence in the United States or the alien's distance from the border.

In turn, Section 1225(b)(2) provides that "an alien who is an applicant for admission" "shall be detained" pending removal proceedings if the "alien *seeking admission* is not clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A) (emphasis added). The statute's use of the term "shall" makes clear that detention is mandatory, *see Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998), and the statute makes no exception for the duration of the alien's presence in the country or where in the country he is located. Therefore, the statute's plain text mandates that DHS detain all "applicants for admission" who do not fall within one of its exceptions.

Petitioner falls squarely within the statutory definition. Petitioner's own allegations confirm he meets the definition, as he is a noncitizen "present in the United States who has not been admitted." *See* ECF 4 at 3 ("Petitioner, a native and citizen of Mexico, entered the United States without inspection on March 31, 2006.") Moreover, Petitioner cannot—and did not—establish that he is "clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A). Therefore, Petitioner "shall be detained for a proceeding under [8 U.S.C. § 1229a]."

ii.     Section 1225(b)(2)'s reference to aliens "seeking admission" does not narrow its scope.

Petitioner wants to short circuit this analysis by shifting the Court's focus to the phrase "seeking admission," in § 1225(b)(2):

> Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien *seeking admission* is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

8 U.S.C. § 1225(b)(2)(A). His argument is that a noncitizen who is an "applicant for admission" must *also* be "seeking admission" before the mandatory detention provisions of § 1225(b)(2) are triggered. *See* ECF 4 at 15–27. But the statute itself makes clear that an alien who is an "applicant for admission" *is* necessarily "seeking admission." The statutory text and context show that being an "applicant for admission" is a means of "seeking admission"—no additional affirmative step is necessary. In other words, every "applicant for admission" is inherently and necessarily "seeking admission," at least absent a choice to pursue voluntary withdrawal or voluntary departure.

The language of Section 1225(a) is instructive. There, Section 1225(a)(3) provides "[a]ll aliens . . . who are applicants for admission *or otherwise* seeking admission or readmission . . . shall be inspected." 8 U.S.C. § 1225(a)(3) (emphasis added). The word "[o]therwise' means 'in a different way or manner[.]'" *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 535 (2015) (quoting Webster's Third New International Dictionary 1598 (1971)); *see also Att'y Gen. of United States v.*

16

*Wynn*, 104 F.4th 348, 354 (D.C. Cir. 2024) (same); *Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 963-64 (11th Cir. 2016) (en banc) ("or otherwise" means "the first action is a subset of the second action"); *Kleber v. CareFusion Corp.*, 914 F.3d 480, 482-83 (7th Cir. 2019). Being an "applicant for admission" is thus a particular "way or manner" of seeking admission, such that an alien who is an "applicant for admission" *is* "seeking admission" for purposes of Section 1252(b)(2)(A). No separate affirmative act is necessary. *See Matter of Lemus-Losa*, 25 I & N. Dec. 734, 743 (BIA 2012) ("[M]any people who are not *actually* requesting permission to enter the United States in the ordinary sense are nevertheless deemed to be 'seeking admission' under the immigration laws").

Petitioner argues that the term "seeking admission" must have independent meaning when used in Section 1225(b)(2)(A), lest it be redundant with the phrase "applicant for admission." But as explained above, "applicant for admission" covers a subset of aliens "seeking admission." The phrase "in the case of an alien who is an applicant for admission," offset at the beginning of Section 1225(b)(2)(A), modifies and narrows the scope of the remaining language—"if the examining immigration officer determines that an alien seeking admission is not . . . entitled to be admitted, the alien shall be detained." The structure of the provision indicates that any such redundancy simply serves to make the provision more readable. This is not a case where the additional language serves to limit the provision's scope.

In any event, "[t]he canon against surplusage is not an absolute rule." Marx v. Gen. Revenue Corp., 568 U.S. 371, 385 (2013). "[R]edundancies are common in

17

statutory drafting—sometimes in a congressional effort to be doubly sure, sometimes

because of congressional inadvertence or lack of foresight, or sometimes simply because

of the shortcomings of human communication." *Barton v. Barr*, 590 U.S. 222, 239

(2020). Thus, "[t]he Court has often recognized: 'sometimes the better overall reading of

a statute contains some redundancy.'" *Id*. (quoting *Rimini St., Inc. v. Oracle USA, Inc.*,

586 U.S. 334, 346 (2019)). For that reason, "the surplusage cannon . . . must be applied

with statutory context in mind," *United States v. Bronstein*, 849 F.3d 1101, 1110 (D.C.

Cir. 2017), and "redundancy in one portion of a statute is not a license to rewrite or

eviscerate another portion of the statute contrary to its text." *Barton*, 590 U.S. at 223.

That is the case here. Under a straightforward reading of the statute, being an

"applicant for admission" is "seeking admission." Although that reading may lead to

some redundancy in Section 1225(b)(2)(A), that is "not a license to rewrite" Section 1225

"contrary to its text." *Barton*, 590 U.S. at 223; *see also Heyman v. Cooper*, 31 F.4th

1315, 1322 (11th Cir. 2022) (The principle that "sometimes drafters do repeat

themselves" . . . "carries extra weight where . . . the arguably redundant words that the

drafters employed . . . are functional synonyms"). And that is especially true, where that

re-writing would be so clearly contrary to Congress's objective in passing the law.

     iii.  Section 1226(c) does not support Petitioner's argument.

Petitioner agues Federal Respondents' interpretation would render superfluous

some or all of Section 1226(c), which is a separate mandatory detention provision for

certain inadmissible and criminal aliens. ECF 4 at 27–33. That too is incorrect. Although

Section 1226(c) and Section 1225(b)(2) overlap for some aliens, each provision has

18

independent effect. Section 1226(c) has substantial independent effect beyond aliens that entered without admission, and Section 1225(b)(2) covers circumstances beyond release from another entity's custody.

To begin, Section 1226(a) authorizes the Executive to "arrest[] and detain[]" *any* "alien" pending removal proceedings but provides the Executive also "may release the alien" on bond or conditional parole. 8 U.S.C. § 1226(a). Section 1226(a) provides the detention authority for the significant group of aliens who are *not* "applicants for admission" subject to Section 1225(b)(2)(A)—specifically, aliens who have been admitted to the United States but are now removable. For example, the detention of any of the millions of aliens who have overstayed their visas will be governed by Section 1226(a), because those aliens (unlike Petitioner) *were* lawfully admitted to the United States.

Section 1226(c) is the exception to Section 1226(a)'s discretionary detention regime. It requires the Executive to detain "any alien" who is deportable or inadmissible for having committed specified offenses or engaged in terrorism-related actions "when the alien is released" from another entity's custody. *See* 8 U.S.C. § 1226(c)(1)(A)–(E). Like Section 1226(a), subsection (c) applies to significant groups of aliens *not* encompassed by Section 1225(b)(2), such as visa overstayers or aliens who are lawfully present but have committed certain crimes.

Most obvious, Section 1226(c)(1) requires the Executive to detain aliens who *have been admitted* to the United States and are now "deportable." *See* 8 U.S.C. § 1226(c)(1)(B)–(C). By contrast, Section 1225(b)(2) has no application to admitted

aliens. Next, Section 1226(c)(1) requires detention of aliens who are "inadmissible" on certain grounds, *see* 8 U.S.C. § 1226(c)(1)(A), (D), (E). Those provisions, too, sweep more broadly than Section 1225(b)(2), because they cover aliens who are inadmissible but were erroneously admitted. *See* 8 U.S.C. § 1227(a), (a)(1)(A) (providing for the removal of "[a]ny alien … in *and admitted to* the United States," including "[a]ny alien who at the time of entry or adjustment of status was within one or more of the classes of aliens *inadmissible* by the law existing at the time…." (emphasis added)). In this respect, Section 1226(c)(1) applies to admitted aliens, who are not covered by Section 1225(b)(2).

Nor does the Government's reading render superfluous Congress's recent amendment of Section 1226(c) through the Laken Riley Act. That law requires mandatory detention of criminal aliens who are "inadmissible" under 8 U.S.C. § 1182(a)(6)(A), (a)(6)(C), or (a)(7). *See* 8 U.S.C. § 1226(c)(E)(i)–(ii).  As with the other grounds of "inadmissibility" listed in Section 1226(c), both (a)(6)(C) and (a)(7) apply to inadmissible aliens who were admitted in error, as well as those never admitted. That means there is no surplusage, as Section 1225(b)(2) has no application to aliens who were admitted in error.

To be sure, the Laken Riley Act's application to aliens who are inadmissible under §1182(a)(6)(A)—for being "present . . . without being admitted or paroled"—overlaps with Section 1225(b)(2)(A). Both statutes mandate detention of "applicants for admission" who fall within the specified grounds of inadmissibility. But again, "[r]edundancies are common in statutory drafting," and are "not a license to rewrite or eviscerate another portion of the statute contrary to its text." *Barton*, 590 U.S. at 223;

*supra*, p. 16–17. And "even assuming there were surplusage, that cannot trump the plain meaning of [Section] 1225(b)(2)." *Mejia Olalde*, 2025 WL 3131942, at *4.

Moreover, Sections 1225(b)(2) and 1226(c) use different language that reflects the distinct obligations each section imposes. Section 1226(c), which applies "when [a criminal] alien is released" from another entity's custody, specifies that the "Attorney General shall take into custody" the alien. That provision therefore directs the Executive to take affirmative steps to apprehend covered aliens when they are released from state or federal custody. *Id.*; *see Nielson v. Preap*, 586 U.S. 392, 414 (2019) (explaining that "the duty to arrest is triggered[] upon release from criminal custody"). Section 1225(b)(2), by contrast, applies "if an examining officer determines" that the alien "is not clearly and beyond a doubt entitled to be admitted," and directs that the alien "shall be detained." That distinct language does not itself impose an obligation on the Executive to apprehend such an alien; it applies once an examining officer has encountered an applicant for admission. *Id.* Each provision thus has independent application—one states that the Executive "shall take into custody" certain aliens in specified circumstances, insisting that the Executive prioritize certain criminal aliens for apprehension; the other states that an alien "shall be detained" once encountered by immigration officials. Because "Section 1226(c) regulates not only *what* the Attorney General must do (take aliens into custody), but also *when* the Attorney General must do so," while Section 1225 "does not specify a timeline," the Government's reading of Section 1225 "does not render the Laken Riley Act superfluous." *Mejia Olalde*, 2025 WL 3131942, at *4.

Section 1226(c) does additional independent work, despite any overlap, by narrowing the circumstances under which aliens may be *released* from mandatory detention. For aliens subject to mandatory detention under Section 1225(b)(2), IIRIRA allows the Executive to "temporarily" parole them "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(b)(5). Section 1226(c)(1) takes that option off the table for aliens who have also committed the offenses or engaged in the conduct specified in Section 1226(c)(1)(A)–(E). As to those aliens, Section 1226(c) *prohibits* their parole and authorizes their release only if "necessary to provide protection to" a witness or similar person "and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding." 8 U.S.C. § 1226(c)(4). So even as to aliens who are already subject to mandatory detention under Section 1225(b)(2), Section 1226(c) is not superfluous; it significantly narrows the Executive's parole power with respect to those aliens.

Given Petitioner's failure to show a likelihood of success on the merits, the Court can deny Petitioner's Motion without considering the remaining *Dataphase* factors. *See Devisme v. City of Duluth*, No. 21-CV-1195, 2022 WL 507391, at *4 (D. Minn. Feb. 18, 2022) ("Because [Petitioner] has not demonstrated a likelihood of success on the merits, the Court need not address the remaining *Dataphase* factors."). But even if the Court were to consider the other factors, Petitioner's request should fail.

### 2.    Petitioner cannot establish irreparable harm.

Regardless of the merits his or her claims, a plaintiff must show "that irreparable injury is likely in the absence of an injunction." *Singh v. Carter*, 185 F. Supp. 3d 11, 20 (D.D.C. 2016).  To be considered "irreparable," a plaintiff must show that absent granting the preliminary relief, the injury will be "'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). The significance of the alleged harm is also relevant to a court's determination of whether to grant injunctive relief. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law."); *E.B. v. Dep't of State*, 422 F. Supp. 3d 81, 88 (D.D.C. 2019) ("While 'there is some appeal to the proposition that any damage, however slight, which cannot be made whole at a later time, should justify injunctive relief,' the Court cannot ignore that 'some concept of magnitude of injury is implicit in the [preliminary injunction] standards.'") (quoting *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1026 (D.D.C. 1981)).

Petitioner cites the potential negative consequences of being detained generally and the possibility of not being able to communicate with counsel as a basis for irreparable harm. ECF 4 at 9. Because Federal Respondents have agreed not to move Petitioner out of the Districts of North Dakota or Minnesota until the resolution of the

pending habeas matter unless in the case of exigent circumstances, Erdmann Decl. at ¶ 3, Ex. A, these claims for emergency relief are moot. To the extent Petitioner relies on the fact of detention in support of his argument regarding irreparable harm, Respondents note that it is mandatory under the statute for the duration of removal proceedings. Detention is not indefinite. Petitioner cannot meet his burden to establish irreparable harm.

### 3.    The public interest and the balance of the equities favor Federal Respondents.

The two remaining *Dataphase* factors—the public interest and the balance of harms—also weigh against injunctive relief. "For practical purposes, these factors 'merge' when a plaintiff seeks injunctive relief against the government." *Let Them Play MN v. Walz*, 517 F. Supp. 3d 870, 888 (D. Minn. 2021).

Under the balance of harms factor, "[t]he goal is to assess the harm the movant would suffer absent an injunction, as well as the harm other interested parties and the public would experience if the injunction issued." *Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 875 (D. Minn. 2015) (citing *Pottgen v. Missouri State High Sch. Activities Ass'n*, 40 F.3d 926, 928 (8th Cir. 1994)). When balancing the harms, courts will also consider whether a proposed injunction would alter the status quo, finding that such proposals weigh against injunctive relief. *See, e.g., Id.*; *Amigo Gift Ass'n v. Exec. Props., Ltd.*, 588 F. Supp. 654, 660 (W.D. Mo. 1984) ("[B]ecause [Petitioner] is not seeking the mere preservation of the status quo but rather is asking the Court to drastically alter the status quo pending a resolution of the merits, the Court finds that the balance of the equities tips decidedly in favor of [Respondent].").

Importantly, the Court must take into consideration the public consequences of injunctive relief against the government. *See Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) (cautioning that the Court "should pay particular regard for the public consequences" of injunctive relief). The government has a compelling interest in the steady enforcement of its immigration laws. *See Miranda v. Garland*, 34 F.4th 338, 365–66 (4th Cir. 2022) (vacating an injunction that required a "broad change" in immigration bond procedure); *Ubiquity Press Inc. v. Baran*, No 8:20-cv-01809-JLS-DFM, 2020 WL 8172983, at *4 (C.D. Cal. Dec. 20, 2020) ("the public interest in the United States' enforcement of its immigration laws is high"); *United States v. Arango*, CV 09-178 TUC DCB, 2015 WL 11120855, at 2 (D. Ariz. Jan. 9, 2015) ("the Government's interest in enforcing immigration laws is enormous.").

Judicial intervention would only disrupt the status quo. *See, e.g.*, *Slaughter v. White*, No. C16-1067-RSM-JPD, 2017 WL 7360411, at * 2 (W.D. Wash. Nov. 2, 2017) ("[T]he purpose of a preliminary injunction is to preserve the status quo pending a determination on the merits."). The Court should avoid a path that "inject[s] a degree of uncertainty" in the process. *USA Farm Labor, Inc. v. Su*, 694 F. Supp. 3d 693, 714 (W.D.N.C. 2023). The BIA exists to resolve disputes like the one regarding Petitioner's detention. *See* 8 C.F.R. § 1003.1(d)(1). By regulation it must "provide clear and uniform guidance" "through precedent decisions" to "DHS [and] immigration judges." *Id.* Respondents respectfully ask that the Court allow the established process to continue without disruption.

## IV.    Conclusion.

For the foregoing reasons, Federal Respondents respectfully request that the Court

deny Petitioner's motion for a temporary restraining order or preliminary injunction, deny

his habeas petition, and dismiss the case.

Dated:  December 12, 2025

NICHOLAS W. CHASE
United States Attorney

By:    */s/ Tara Vavrosky Iversen*
TARA VAVROSKY IVERSEN
Assistant United States Attorney
MN Bar ID 0387790
tara.iversen@usdoj.gov

KENT ROCKSTAD
Assistant United States Attorney
ND Bar ID 05434
655 First Avenue North, Suite 250
Fargo, ND  58102-4932
(701) 297-7400
kent.rockstad@usdoj.gov

Attorneys for the United States of America